ISLAND LAKE WATER COMPANY, Plaintiff-Appellant, *v.* ILLINOIS COMMERCE COMMISSION, Defendant-Appellee.

Second District  No. 77-458

Opinion filed November 8, 1978.

Frank M. Pfeifer and Thomas W. Kelty, both of Springfield, for appellant.

William J. Scott, Attorney General, of Chicago (Mary C. Ubatuba, Hercules F. Bolos, James E. Weging, and Thomas J. Swabowski, Assistant Attorneys General, of counsel), for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The Island Lake Water Company (the Company) appeals from an order of the circuit court of Lake County which affirmed an order of the Illinois Commerce Commission (the Commission) denying a requested 30% increase in water rates.

The appeal principally questions findings 10 and 12 of the Commission's order. Finding No. 10 states:

"The proposed rate schedules of Respondent would produce operating revenues of about $73,340 and operating income of about $18,985, but would result in rates which exceed the value of service to the customers, and would be virtually the highest in the State."

Finding No. 12 provides:

> "The rates set forth in Appendix 'A' attached hereto and made a part hereof, resulting in annual operating revenues of about $62,927 and annual operating income of about $11,017, are reasonable and just and should be approved."

In particular issue is whether the Commission's order contains sufficient findings for our review; if it does whether the findings support the order, and if so, whether the order is supported by the evidence.

■■ The Commission is required to make findings sufficient for a judicial review of the case and which clearly disclose the grounds upon which the agency acted. (*Reinhardt v. Board of Education*, 61 Ill. 2d 101, 103 (1975).) It has been stated that findings which will enable the court to intelligently review a commission order in a rate case should succinctly set forth the pro forma operating revenues, pro forma operating expenses, net original cost,[1] rate base and the rate of return to which the utility is entitled. (*Camelot Utilities, Inc. v. Illinois Commerce Com.*, 51 Ill. App. 3d 5, 8-9 (1977).) The Commission is also required to consider what the rate of return to each class of security holder will be under a proposed rate. *City of Alton v. Commerce Com.*, 19 Ill. 2d 76, 86 (1960).

While the order of the Commission is not a model of clarity it does contain findings as to pro forma operating revenue, pro forma operating expenses, net original cost and actual return. Although the rate of return as a percentage of the rate base is not expressly stated it can be computed to be 4.72% based on the finding that the Company's rate base as of December 31, 1975, was $232,957 and its annual operating income would be about $11,017. A focus of the Illinois cases is on the fair rate of return as a percentage of "fair value." Thus, although no findings were made as to a proposed recapitalization testified to by an accountant for the Company, nor as to whether the rate offered a reasonable return to the owners of the equity of the Company, we conclude that the findings are sufficient for our determination of whether a reasonable return to the investor is afforded on the basis of the fair value of the utility property. *Illinois Bell Telephone Co. v. Commerce Com.*, 414 Ill. 275, 286 (1953). See also *City of Alton v. Commerce Com.*, 19 Ill. 2d 76, 86 (1960); *Illinois Bell Telephone Co. v.*

---

[1] The Illinois Supreme Court has, in the past, required the use of present fair value, rather than original cost, in seeking to determine a public utility's rate base. (See, *e.g.*, *Illinois Bell Telephone Co. v. Commerce Com.*, 55 Ill. 2d 461, 466-67 (1973).) In 1973, however, the Commerce Commission abandoned the present fair value test and adopted original cost as the appropriate rate base. (See reference to this change in *Illinois Bell Telephone Co. v. Commerce Com.*, 55 Ill. 2d 461, 467; see also Levin, *Illinois Public Utility Law and the Consumer: A Proposal to Redress the Imbalance*, 26 DePaul L. Rev. 259, 272-73 (1977).) Our research has failed to disclose any case in which the supreme court has approved the original cost method of valuation.

We, however, need not reach the issue of the propriety of using this method since appellant has not challenged the Commission's action in this respect.

*Commerce Com.*, 55 Ill. 2d 461, 478 (1973); *Union Electric Co. v. Illinois Commerce Com.*, 48 Ill. App. 3d 967, 970 (1977).

■■■ It is undisputed that the fixing of utility rates is a legislative function and that the scope of judicial review is a limited one. (See, *e.g., Village of Milford v. Commerce Com.*, 20 Ill. 2d 556, 561 (1960).) The findings and conclusions of the Commission on questions of fact are held to be prima facie true as found and, in general, the order of the Commission will not be set aside unless it clearly appears that its findings are against the manifest weight of the evidence or in contravention of some established rule of law or constitutional right. (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72; *Village of Milford v. Commerce Com.*, 20 Ill. 2d 556, 561.) Also, where the findings do not support the order, the order will be set aside. However, where the findings do not support the order, we are not called upon to examine the evidence to determine whether it discloses facts which, if found, would sustain the Commission's decision. (*Brinker Trucking Co. v. Commerce Com.*, 19 Ill. 2d 354, 357 (1960); *Commerce Com. v. New York Central R.R. Co.*, 398 Ill. 11, 15 (1947).) "While we may not supply a reasoned basis for the agency's action that the agency itself has not given [citation], we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. [Citation.]" *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286-87, 42 L. Ed. 2d 447, 456, 95 S. Ct. 438, 442 (1974). See also *Illinois Bell Telephone Co. v. Commerce Com.*, 55 Ill. 2d 461, 472 (1973).

■■ Following these criteria we must conclude that the findings of the Commission do not adequately support its order.

The Commission stated only two reasons for its rejection of the Company's proposed rates, that they would exceed the value of service to the customer and would be virtually the highest in the State (Finding 10). The Commission also found that the new approved water rates would produce an annual operating revenue of $11,017 and would be "reasonable and just" (Finding 12).

It is true that a utility may be made to accept a diminished rate of return where its inefficiency is the cause of the company's lack of funds. (See, *e.g., State ex rel. Utilities Com. v. General Telephone Co.*, 285 N.C. 671, 683-86, 208 S.E.2d 681, 689-90 (1974); *North Florida Water Co. v. Bevis*, 302 So.2d 129, 130 (Fla. 1974).) However, there is no finding or other substantial support in the record from which it may be concluded that the Company's inefficiency is the cause of its lack of funds rather than other possible factors such as an antique plant, the inability to attract capital for replacement or the relatively small number of users (624 customers). It therefore cannot be said that the Commission's finding that the proposed rates would have been "virtually" the highest in the State without any explanation supports the Commission's order.

Nor does the finding that the proposed rates would have exceeded the

value of service to the customers support the order. It is true as a general rule that the public should not be required to pay more than the services rendered are reasonably worth. (*State Public Utilities Com. ex rel. City of Springfield v. Springfield Gas & Electric Co.*, 291 Ill. 209, 217 (1919).) However, we find no statement in the Commission's order which would indicate how it went about determining the value of the utility company's service to its customers.

■■ Further, and possibly the most important consideration is, that we cannot agree with the finding that a rate of 4.72% of fair value is reasonably supported. The commission determined the rate base by considering original cost figures, less accumulated provisions for depreciation, less contributions in aid of construction and with the addition of an item for material and supplies on hand. The Company investors were thus given a return of 4.72% on the cost of the original investment, less depreciation.

In *Peoples Gas Light & Coke v. Slattery*, 373 Ill. 31, 68 (1939), the Illinois Supreme Court held that, "if [a public utility] company could take a sum equivalent to the value of its property and invest it soundly, so as to insure a rate of return in excess of the return authorized by the commission, this would be proof, or at least evidence, of confiscation * * *." The supreme court in *Slattery* then proceeded to consider the yields of the highest grade public utility, industrial and railroad bonds in 1936, the year of the Commission's order; it found those yields to be less than the rate of return permitted the complaining utility and, consequently, held the rate of return to be nonconfiscatory.

■■ Thus, it would appear, in the instant case, that this court should examine the yields of the highest grade public utility, industrial and railroad bonds in the year 1976 to determine if the challenged 4.72% rate of return is at least equal to those yields. First, we note that this court may take judicial notice of economic conditions. (See, *e.g.*, *Peoples Gas Light & Coke Co. v. Slattery*, 373 Ill. 31, 69 (1939). See also *Lahman v. Gould*, 82 Ill. App. 2d 220, 229 (1967).) We may also take notice of economic data by reference to authoritative tabulations of such data. (See, *e.g.*, *Kaiser v. Kaiser*, 290 Minn. 173, 181 n. 4, 186 N.W.2d 678, 684 n. 4 (1971).) Further, "the failure or even refusal of a trial court to take judicial notice of a fact does not prevent an appellate court from doing so." (*Wheeler v. Aetna Casualty & Surety Co.*, 11 Ill. App. 3d 841, 854 (1973).) " 'If the trial court does not take notice of a fact cognizable by it, the reviewing court may do so, even so.' " *Wheeler*, 11 Ill. App. 3d 841, 853.

It appears that in 1976 the yield of the highest grade public utility bonds was between 8.15% and 8.86%. (45 Moody's Bond Record No. 9, at 2 (Sept. 1978).) The highest grade industrial[2] bonds in 1976 carried yields in the

---

[2] As a result of the dearth of Aaa-rated railroad bonds, Moody's Aaa railroad bond yield average was discontinued as of December 18, 1967. Consequently, we cannot use the yields of railroad bonds in 1976 to seek to determine the fairness of the rate of return allowed the utility in the instant case.

range of 7.81% to 9.33%. (45 Moody's Bond Record No. 9, at 2 (Sept. 1978).) It is noteworthy that on the day the Commission rendered its decision in the instant case (September 16, 1976), the closing prices for the highest quality public utility bonds were such as to produce a yield of 8.58%. (68 Moody's Bond Survey No. 38, at 960 (September 20, 1976).) In 1975, the yields of the highest grade public utility bonds ranged between 8.79% and 9.21%; in that same year, the yields of the highest grade industrial bonds were between 8.44% and 8.78%. In 1977, the yields of the highest quality public utility bonds lay between 8.07% and 8.34%. The comparable figures for the highest grade industrial bonds for 1977 are 7.76% to 8.04%. 45 Moody's Bond Record No. 9, at 2 (Sept. 1978).

The foregoing figures indicate that a rate of return of 4.72% in 1976 was unreasonably low, if not confiscatory.

Also, as the Company argues, since the Island Lake investors could receive a return of 5% in an ordinary passbook account in a bank, the return of 4.72% must be regarded as inadequate. We further note that the Illinois Supreme Court has held that "[o]rdinarily the utility is entitled to a rate of return not less than the legal rate of interest" (*State Public Utilities Com. ex rel. City of Springfield v. Springfield Gas & Electric Co.*, 291 Ill. 209, 233 (1919)); and that the legal rate of interest in Illinois at this time is 5%. Ill. Rev. Stat. 1977, ch. 74, par. 1.

A comparison of several similar cases decided in the 1970's indicates that a rate of return of 4.72% is insufficient. In *Illinois Bell Telephone Co. v. Commerce Com.*, 55 Ill. 2d 461, 478 (1973), a rate of return of 7.33% was held not to be erroneous; and in the case, the Commission used the year 1971 as its test year (55 Ill. 2d 461, 474).[3] Also, in *Nader v. F.C.C.*, 520 F.2d 182 (D.C. Cir. 1975), the court held that the Federal Communications Commission did not err in allowing A. T. & T. a rate of return on its interstate investment of 8.5% (520 F.2d 182, 191). The Federal Communications Commission's original order was entered on November 22, 1972. The United States experienced in 1972 a rate of inflation of only 3.4% (December to December basis). This is to be compared with a 4.8% rate of inflation (December to December basis) for the year 1976. (Bureau of Labor Statistics, U.S. Department of Labor, Consumer Price Index (Dec. 1972; Dec. 1976).)[4] See also *Monarch Gas Co. v. Illinois Commerce Com.*, 51 Ill. App. 3d 892, 897 (1977).

---

[3] The United States experienced a 3.4% rate of inflation, on a December to December basis, in 1971; the inflation rate in 1971, on an annual average basis, was 4.3%. The comparable figures for 1976 are 4.8% (December to December basis) and 5.8% (annual average basis). Bureau of Labor Statistics, U. S. Department of Labor, Consumer Price Index (Dec. 1971; Dec. 1976).

[4] The rates of inflation, on an annual average basis, for the years 1972 and 1976 were 3.3% and 5.8%, respectively. Bureau of Labor Statistics, U. S. Department of Labor, Consumer Price Index (Dec. 1972; Dec. 1976).

Since we have concluded that the findings of the Commission do not support the order we are not required to review the evidence to further determine whether the evidence supports the findings. However, it appears that were we to reach the issue, we would find that the evidence does not support the findings. At the third hearing held before the Commission on April 8, 1976, an exhibit prepared by the staff of the Illinois Commerce Commission based on the evidence adduced at the two previous hearings was admitted into evidence. The staff report indicated a total rate base (original cost less depreciation) of \$235,406 as of December 31, 1975. The Commission, however, disallowed a "working capital cash requirement" of \$2,449; the Commission thus found that the rate base of the Company was only \$232,957. In 1975 the Company had a net operating income of \$7,814 which is 3.32% of the rate base; and under the Company's proposed rates, the Company would have had a net operating income of \$18,985, which is 8.06% of the rate base. The staff did not seek to determine the reproduction cost new of the plant and equipment. In addition there was testimony of the Company's manager that since 1972 the Company had completely rejuvenated its chemical treatment equipment and had put a new pump in one of the three major sources of water supply for the Company and had also installed several new water mains. In addition, there was testimony of a patron of the Company who said that the water was bad, the pressure was bad, and the service was bad. Petitions were signed by water patrons who protested any rate increase. The mayor of Island Lake argued at one of the hearings that the increase should be turned down because the pipe footage was only 2 inches in diameter. At best the evidence adduced by the patrons would support a finding that the Company was rendering substandard service but does not indicate that this was due to any lack of care or diligence on the part of the Company.

The testimony of a village trustee that a water engineer employed by the Illinois Commerce Commission had informed him that the residents of Island Lake pay the highest water rates of any privately owned company in northeastern Illinois rests entirely on hearsay. Further, the witness did not assert that the water rates in northeastern Illinois were the highest in the State, but simply stated that if they were the residents of Island Lake would be paying the highest rates. This would not support the finding that the residents were paying "virtually the highest rates" in the State. It is, of course, true that the commissioners are not allowed to act on their own information but must base their findings on evidence present in the case. See *Fleming v. Illinois Commerce Com.*, 388 Ill. 138, 149 (1944).

The Commission, in our view, has not articulated a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 9 L. Ed. 2d 207, 216, 83 S. Ct. 239,

246 (1962). See also *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286-87, 42 L. Ed. 2d 447, 456, 95 S. Ct. 438, 442 (1973).

We therefore reverse the order of the Commission and remand the cause to the circuit court with directions to remand to the Commission for further proceedings in accordance with the views expressed in this opinion.

Judgment reversed; cause remanded with directions.

GUILD and WOODWARD, JJ., concur.